All right, Ms. Bryan, when you're ready, we'll hear from you first. I don't want to run out of power during a 20-minute argument. Always be prepared. Yes. Good morning, your honors, and may it please the court. Before I start my argument, for the courtesy of those listening, I just want to warn that this case involves graphic descriptions of self-harm. Jamie Leonard was arrested on July 19, 2017, in the midst of a psychotic episode. And from the moment that he arrived at the St. Charles County Jail the following day, he was in obvious need. But the defendants failed to take reasonable measures to abate a risk of serious harm to Mr. Leonard, and he decompensated in front of jail staff, ultimately gouging out his own eyeball. The defendants repeatedly ignored Jamie Leonard's obvious needs, despite having the tools to help him. Nurse Martin failed to provide Mr. Leonard with medication he was prescribed by outside providers, even though Mr. Leonard's mother dropped him off at the jail, conveyed directions for administering the medication, and emphasized his pre-existing mental health issues and writer syndrome that affected his left eye. Nurse Martin continued to withhold this medicine, even though she personally observed him attempt to choke himself by putting his hand down his throat, shove his fingers up his nose so hard that it bled and had to be packed, pull on his genitals, and tell her, I quote, I have to get my soul out because it is time for me to die, end quote. When Jamie Leonard told her that, that it was time for him to die, Nurse Martin just had him transferred to the Suicide Prevention Unit. And there in the SPU, the defendants stood outside Jamie Leonard's cell for nearly five minutes and watched him gouge his eye out, despite, according to uncontested correctional expert Ken Katsaris, that they had more than enough backup to enter the cell and prevent the harm. Plaintiff's uncontroverted medical expert also testified that were Mr. Leonard properly medicated, again with prescriptions that came into the jail shortly after he arrived there, the entire incident could have been prevented. But instead, the defendants made a conscious decision to merely watch him hurt himself. On the facts in the record, a jury could find that the defendants were deliberately indifferent to Mr. Leonard's serious medical needs and used unwarranted and excessive force against him. There are many claims that we've raised on appeal. Given the limited time today, I'd like to focus on three specific claims. Before you do, I just wanted to ask you, on Nurse Martin, you had mentioned this, the placement in the suicide prevention cell and the constant monitoring. We're at criminal recklessness land, and I am troubled by the fact that he didn't get his medications, assuming they came in the prison, which we have to at this point. But does it really rise to the level of criminal recklessness for Nurse Martin? And I say that because she did take some precautions. And when you have a mentally ill individual in the jail, one of the things you're trying to prevent against is self-harm or harm to others. And I think it's fair to say suicide prevention cell is supposed to do that. So was she really criminally reckless? Yes. On the facts and the record viewed in the light most favorable to the plaintiff, they established that Nurse Martin was criminally reckless. She showed apathy or unconcern. And there's also clearly established case law from this court to support that conclusion, including Dad v. Anoka County, a 2016 decision where this court held that it's clearly established that delay in the provision of treatment or in providing examinations can violate the individual's rights when their ailments are medically serious or painful in nature. And Folks v. Cole County, which is an earlier Eighth Circuit case, that held that if a reasonable official would have known that treatment and monitoring were necessary, the refusal to provide access to treatment would constitute deliberate indifference. It's our position that simply transferring Mr. Leonard to the Suicide Prevention Unit for monitoring was not sufficient to respond to his serious medical needs. It was not reasonable measures given what Ms. Martin saw him experiencing personally and heard from other offices being reported to her. One follow-up on that exact point. Can we count the fact that my understanding is Nurse Martin also when he injured his eye, no, right after the pepper spray, excuse me, had recommended that he be put outside the Suicide Prevention Cell so that he could wash out his eyes. It turns out that somebody else made the decision that they couldn't move him somewhere else to a better medical area. Can we count that in terms of the overall sort of mens rea that Nurse Martin had, the fact that maybe she didn't do a great job with the mental illness, but she might have gone a little further on the physical injuries he suffered? Well, it's true that there are a number of points during Mr. Leonard's short confinement at the jail that many jail staff members failed to do what they were supposed to do. They failed to do what they were required to do under the Constitution. That does not vitiate Nurse Martin's liability for failing to meet his serious medical need for psychiatric medication that he was prescribed. And the right to have access to your prescribed medication when you're detained is actually something that's directly addressed by this court in Dad v. Anoka County. That's a case where someone was arrested the day after having oral surgery, and they had been prescribed Vicodin for the pain. And the jail knowingly withheld that Vicodin, not because of medical judgment, but because of indifference, despite the fact that the detainee was in indescribable pain, as Mr. Leonard testifies he was, and couldn't eat and couldn't drink. And this court held that that was sufficient to state a claim for deliberate indifference for failing to provide prescribed medication. So here, Nurse Martin knew at the time, she testified she knew, at the time that she was treating him, that he had these prescribed medications. But she ignored his obvious need. And I've already talked about some of the incidents of self-harm that she personally witnessed. She also heard threats of self-harm. She observed him pacing, flushing water, talking to himself, yelling. I really don't think there's any way that the defendants can contest that he was experiencing acute psychosis and that that constitutes a serious medical need. And on the facts and the record, a reasonable jury could find that just transferring him to the SPU and not providing him with his prescribed medication or calling the psychiatrist on call constitutes deliberate indifference. I also want to touch on, before my time is up, the excessive force claim against Defendant Harris. That's the officer who administered the OC spray on Mr. Leonard during an unnecessary cell search in the SPU, and the deliberate indifference claim against Sergeant Baker for failing to intervene when she was standing outside of Mr. Leonard's cell and observing him engage in self-harm, scratching, tugging, pulling at his left eyeball, until he was able to get it out of his socket. At some point, as we were just talking about, Nurse Martin did have Mr. Leonard transferred to the Suicide Prevention Unit. And shortly thereafter, the officers conducted a cell search. And before they went into the cell search, SBO Fisher told Officer Harris, against whom this claim is raised, to have his pepper spray out and ready. So this was a planned use of force. Now, it's important to keep in mind the circumstances that they were going into. Again, Mr. Leonard in a state of acute psychosis, fully naked, in a suicide prevention cell, which is stripped of things that a person could use to harm themselves with. And as the uncontested correctional expert in this case testified, this search was totally unnecessary. And so was the use of force. Again, Mr. Leonard was handcuffed. He was naked. He was no physical threat. There were multiple officers. There were three officers in the cell with him. Their bodies were between him and the cell door. That's at 602 of the appendix. And there were merely four seconds that passed between the time that Mr. Leonard stood up from his knees and the pepper spray was deployed. He was sprayed not because he was threatening, but simply because he refused to obey an order, the order to stay on his knees during the cell search. But as this court has held, and others, mere refusal to obey orders cannot justify the use of pepper spray. And Defendant Harris expressly admitted that he perceived no physical threat at the time that he deployed force. Worth noting, as the uncontested expert Katsaris does, the defendant Harris is a martial arts expert. That's at 455 of the appendix. But he made no attempt to temper or limit the force used. He made no attempt to restrain Mr. Leonard simply with his hands or relying on the hands of the other two officers who were there. Instead, he immediately used what this court has actually referred to as significant force by deploying OC spray at very close range, approximately one foot, from Mr. Leonard's diseased eye. Excuse me. But there's no dispute that the officers didn't know that he had Reiter's syndrome, correct? Or is that disputed in the record? I don't think it's settled in the record that they knew, even if they didn't know. There's lots of clear testimony about training and instructions on the use of OC spray and keeping a certain distance, whether it's three or four or more feet away from the individual against whom you're using it, so as to avoid the needling effect and injuring the eye. So Officer Harris was both deploying the OC spray too close to Mr. Leonard, but he was also deploying it when he didn't need to. And when assessing the appropriate use of force in a jail setting like this, we apply the six Kingsley factors. So the relationship between the need for force and the amount of force used, the extent of the injury here was very significant, ultimately ended in Mr. Leonard losing his left eye. Any effort made by the officer to temper or limit the force, again, there was none here. Within four seconds, Officer Harris already has that spray ready and deploys it within a foot of Mr. Leonard's eye. Can I ask you a question about the – one thing we haven't mentioned is the size of Mr. Leonard. He's an enormous man, 6'8", 300 pounds. And at least for the officers that were entering the cell later, as you mentioned, he had acute psychosis. And so you have a very large man with psychosis. Does that play into the use of force here, that they were trying to subdue him because they knew if he got away, he could cause significant damage? Look, I'm not going to stand here and tell you that it doesn't matter that he was a big man, because I think it does. I mean, and one of the six Kingsley factors that we have to look at in determining whether force was appropriate is the severity of the security problem. And so the defendants have said he was a big man, he could have escaped the jail cell. But that evidence is contested and, in fact, belied by the video evidence in the record, which shows that he's subdued very quickly. He's, again, handcuffed and naked, surrounded by officers. These are all factors that this court has considered in other contexts in assessing whether the security issue really warranted the use of force. So, for example, in Tatum v. Robinson, that's the shoplifting case that was decided by this court in 2017, where someone was accused of shoplifting. There were two officers and two store employees by this person. The officer ordered him to put his hands on the clothing rack, and he did not comply. And the officer deployed a chemical agent on him within 14 seconds of disobeying the order. And this court found that that was an unreasonable and unconstitutional use of force because there was no immediate threat, he wasn't actively resisting, and the officer wasn't alone. Just as here, Officer Harris wasn't alone. He was one of three officers in what he has described as a very secure unit. The SPU is a very secure unit. And the video calls into question this assertion by the defendants that he was charging toward the door or even darting toward the door. In fact, that's one thing that the district court got wrong, is claiming that the video shows Mr. Leonard darting toward the door. And the reason that that's a wrong conclusion for the district court to make is because the Supreme Court and this court have both held that interpreting video evidence is a job for the jury. That's Scott v. Harris, the 2007 Supreme Court decision, but it's also a decision that this court made in Camporris v. the St. Louis Symphony, 210 F. 3rd, 845. It's a 2000 decision. So yes, his size is a factor to consider, but it's one of many factors to consider, including whether the plaintiff was actively resisting, which is contested here, and the threat that's reasonably perceived by the officer. Again, it's our position that their claim that he was going to escape is belied by the other evidence in the record. But even if the court believes that, there's a question of fact as to whether he was resisting, whether he was trying to leave the cell, especially when you look at the entire period of his detention at the jail. Earlier, he was compliant with officers. Sergeant Baker noted that when he was transferred from the green bench where Nurse Martin had him being watched to the SPU, he was transferred without incident. He, during his time at the jail, never showed any propensity of violence toward any jail staff member or medical staff member. The only person that Mr. Leonard harmed or threatened to harm was himself, and the jail let him do it. Before I run into my rebuttal time, I do want to talk briefly about the deliberate indifference claim against Sergeant Baker. Again, Sergeant Baker was a shift supervisor who was outside of Mr. Leonard's cell watching him engaged in self-harm. She had actual knowledge of his psychosis and his decompensation, and she watched for several minutes and consciously decided not to enter the cell. She did not direct others to enter, and yet she could see everything that was going on, and the reason we know that is Defendant Fisher testified in his deposition that in the SPU, you can look directly into each of the cells, and as your Honor mentioned earlier, the point of the SPU, Suicide Prevention Unit, is to monitor someone, not so you can watch them harm themselves, so you can prevent them from harming themselves. But Sergeant Baker didn't do that here. Now, the defense is, hey, there's a policy that says we have to have appropriate backup before we can enter the cell. Well, it's disputed whether she had appropriate backup. She was never outside of that cell alone. When she arrived, Suicide Prevention Officer Scott was there, and both parties' experts, the plaintiff's expert, Katsaris, and also the new jail director, Keene, testified that she had more than enough backup to go into the cell. She should have gone in earlier, and she could have prevented the harm, but she didn't. Now, we don't know what was going on outside of that cell because we don't have video of it. We don't know what was being shouted by Mr. Leonard as he was engaged in self-harm because we don't have audio, and we don't know what those officers were able to perceive from their vantage point. You know, while we have a video of the self-harm which was provided to the court, and I hope your honors watch despite it being very difficult to watch, it's from a different vantage point than what the officers had. So that's a question for the jury. Again, in your view, what should she have done? In my view, Sergeant Baker, in fact, the law required Sergeant Baker to go into the cell and prevent the harm. She knew of a substantial risk of serious harm to Mr. Leonard. In fact, she was watching it. Is she 6 feet, 8 feet, 6 feet, 8 inches tall? She's not. No, she's not. And, you know, the fact that she's a different size from Mr. Leonard does not excuse her from intentionally delaying her response. Under this court's clearly established precedent, Olson v. Bloomberg. Oh, I see. You didn't expect that she would enter the cell herself, would you? Well, we're not suggesting that she would have entered the cell by herself. As I said, from the moment that she arrived at the cell, she had another officer. She failed to summon any help. That's your argument. No, she failed to intervene to prevent the harm when she could have. And that intervention would have consisted of what? Well, it could have consisted of a number of things. She could have gone in, and they could have restrained Mr. Leonard with the assistance of SPO Scott. In fact, earlier, he was restrained because, again, he was sticking his hands down his throat to try to choke himself and sticking his fingers in the nose. And Nurse Martin said, if you continue to do that, we're going to have to double cuff you so you can't. He continued to do it, so they double cuffed him. So there are a number of things that Sergeant Baker could have done. But what is clearly established under this court's precedent, and a robust consensus of authority from the Ninth, Seventh, and Fourth Circuits, is that when a reasonable officer knows that the person requires medical attention and they intentionally delay going in and preventing the harm or providing attention, that constitutes deliberate indifference. And again, to clarify, what steps did she take or not take to delay the administration of medical assistance? She just stood there. She did nothing to prevent the harm to Mr. Leonard. This is akin to, as Plaintiff's Expert Katzer has testified, watching someone take a bed sheet, tie a noose, put it on a hook, test the weight, and hang themselves and stand there and watch someone do that without intervening, despite having the ability to go in according to uncontested testimony that plaintiffs have in the record that has to be viewed in the light most favorable to the plaintiff and that wasn't mentioned at all in the district court's order. I'm well into my rebuttal time. Can I just ask one more question to follow up on Judge Wolman's point? I just want to understand the facts quickly, which is she was alone. My understanding is I think it's undisputed that she was alone, and then a second woman guard, a female guard, came, and she waited for a third guard according to prison policy before she entered the cell. I just want to make sure that's correct. Actually, Your Honor, Suicide Prevention Officer Scott was outside of the cell at the time that Sergeant Baker arrived at the cell. Okay, so there were two officers. Yes, there were two officers, and then Nurse Martin arrived at some point, and her testimony is inconsistent. She testifies at first that the cell door was open and they were standing there watching him. Would you like to save eight seconds for rebuttal? No, may I finish my point? You may. That also belies the claim that there was a security problem, the fact that Nurse Martin testified the door was open when this was going on. I'm out of time. I'd ask briefly that the court reverse the district court's decision, and thank you so much for your time. Thank you for your argument. Thank you, Mr. Wells. Mr. Wise, we'll hear from you. Thank you, Your Honor. May it please the court, my name is Brian Wise, and I represent Defendants Stephen Harris, Lisa Baker, Dante Fisher, Teresa Martin, and St. Charles County, Missouri. And if defendants respectfully request, the court affirm the decision of Judge Shelf of the district court finding judgment in favor of all defendants on all counts in Mr. Leonard's complaint. I'd like to start by touching on something that Judge Bowman had addressed there regarding Sergeant Baker. Mr. Leonard's counsel referred to a robust consensus of authority relating to what Ms. Baker should have done. There is, in fact, a conflict within these circuits, and in fact the Fifth Circuit in Arenas v. Calhoun, which is, forgive me here, 922F3-616 states that the Eighth Amendment's prohibition against cruel and unusual punishment does not require a corrections officer intervene immediately in a prisoner's apparent suicide without sufficient support from other officers, where doing so would jeopardize his own safety. And that is the situation we had here initially. Officer Christian Scott was there at first, and when Sergeant Baker got there, they did wait for appropriate backup in accordance with jail policy. And they did do so, and then when they did, they did come in and assist Mr. Leonard. With the uncontroverted video testimony, they went in within a few minutes of him starting to really inflict harm. This was a quick response. This was not an extensively delayed response here. Doesn't the video show two minutes and 20 seconds or something of that nature? It was about two minutes and 16 seconds from the time that you saw him really gouging at his eyes with the two hands before someone came in to assist. I believe it was Officer Scott who came in to assist. Given the severity of what was going on, the fact that he was gouging out an eyeball, why wasn't it enough to have two officers? I know that prison policy says three, but given the emergency situation, should two officers have been enough? Not in this case, I don't believe so, Your Honor. The reason being is just prior, before, two officers had difficulty controlling Mr. Leonard when he resisted efforts to control him earlier in the cell just before. In that situation, and in this case, Officer Scott was one of those, was the third officer in the unit. We've been talking about Officer Scott and Lisa Baker in there trying to deal with, again, taking into consideration a 6'8", 300-pound inmate who not only was acting erratically before and resisting arrest and was difficult to control, but also had the capability, was in a state of mind to inflict the pain that he had on his eyes. So he has the ability to inflict great pain upon the officers, and it is within the interest of the officers to protect themselves and make sure they have appropriate backup when entering the cell. Commenting on Olson v. Bloomberg, which they have cited as the case from the Eighth Circuit, which establishes what Sergeant Baker was supposed to do, in that case, the officer heard an inmate's threat to commit suicide, told the inmate, do what you have to do, and left the inmate for about 15 to 25 minutes. Did not return, despite the fact that other inmates were telling the officer that the inmate was hanging himself, in the process of hanging himself. Frankly, dealing with the clearly established standard we're talking about, that the case is to put the officer on notice, that a reasonable officer in her situation was acting wrongfully, and this case simply does not do that, does not set that precedent in terms of the qualified immunity standard. Touching on the question regarding Harris, at APP 148, he did not know. We attest here that he did not know about the plain suicide condition. Again, that's on APP 148, and that touches on a very important principle, which we have to adhere to, that each defendant is only liable for his or her own conduct, and with what they knew at the time. The results have been contended that the search was unnecessary. The search is done in accordance with policy at the end of every shift. It's actually done for the protection of the inmates in the suicide prevention unit. That is, they search for contraband, not to punish or to get anyone in trouble, but to make sure there's nothing in the unit for which they can harm themselves. Granted, there's a sense of irony in that now, but that doesn't change the situation that they did it with the intent of assisting the inmate and doing it in accordance with policy. Do you want to address the nurse and the medications? Absolutely. I'm sorry, let me take this off here. My apologies. With regard to the medicine, again, we are talking about each defendant's own conduct. In this situation, Nurse Martin did not meet with Ms. Manoli, did not speak with her at any point. What she had to go on was the inmate health progress notes, and if you look at what was in the inmate health progress notes, which is at AA 278 to 279, the first one refers to Michelle Manoli calling to discuss the medical history and mentions the writer's syndrome. There's also a note in there that a release of information was signed and sent to the pharmacy to try to confirm the prescriptions which Mr. Leuner had received. There was a note the next morning that there was an attempt to verify the meds, but they could not be verified. Then the afternoon before this incident happened, Ms. Manoli did come in, the plaintiff's mother did come in with medication. They noted it all down in the inmate progress notes. They noted the medications. They also noted that there were eye drops that did not have any instructions on them and that the notes were put into the property bag and that another release of information, another ROI was signed and provided to and sent to Dr. Linda Hunt to try to get verification of the medications. Now we did not have that verification in that time, and that evening when Nurse Martin saw that she did not have an order from the jail doctor, from anyone regarding a verification of medicines to administer any medicines, which actually distinguishes it from Dad Vianoka, because in that situation there was not only the nurse denying to give him any medication whatsoever for his pain, but the jail doctor eventually did provide him with a prescription of ibuprofen and she still denied that medication to him despite receiving that prescription from the jail doctor. I'm just not familiar. When you come into a jail and you've got medications, perhaps a spouse or child brings in medications or whatever, you can't actually receive those medications until the doctor signs off on it and says, that's fine, you can do it. Basically that can obviously take up to a day and a half, two days or whatever after this case. It normally takes much faster than that, but yes, in the situation that we can't just necessarily rely on anyone coming in, off the street coming in, providing pills in a prescription bottle and saying, here, they need this. This wasn't anyone off the street. Yes. It was his mother, correct. It wasn't anyone. I didn't want to make it sound like it was what you said, anyone off the street. So why can't the jail rely on the inmate's mother coming in and saying, here's his prescription medication? Because in this situation I still think you need verification from the pharmacy that prescribed it or the doctor who prescribed it themselves, rather than just simply family. Did the mother bring in? What did she bring in exactly? She brought in. Did she bring in medication that had his name on it? Medication, certain of them had their name on it. And some of them, like I said, the labels were rubbed off. For example, the eye drops, it was unable to be read because of the label being rubbed off. And they noted that in here, that they couldn't read the instructions on it. But there were a certain number of medications. They were partially taken, partially. So are you saying that if the mother had brought in a medication that had his name and it was legible, then the nurse could have proceeded to administer it and that's the problem here? Or are you saying that there's some bureaucratic requirement that even if it's fully documented, they've got to track down a doctor? Well, let's say we've got to track down a doctor. But we do require verification of the medication from either the pharmacy or the doctor before administering it. And then we would end up filling the prescription ourselves and then providing it to them in that situation. Do you call the pharmacy where it was originally prescribed or is it the call to the jail pharmacy? It's the pharmacy where the prescription was originally prescribed. Correct. So you're saying you won't even use the medication that the mother brings in. You will get a new prescription filled, which would also presumably require some time. Well, that would not require too much time because it would be done within our own jail. Once we get the confirmation, we would end up filling it pretty much immediately at that point. If it's in our formulary, if it's not in our formulary, we generally have a generic for everything. Right at the jail? You have a full supply of eye drops? Well, again, it depends on the medication. Sometimes we would need to go to an outside source. Sometimes we have it there available, depending on what it is. But it sounds to me like you wouldn't use the prescription the mom brings in under any circumstances. You would just have it replicated either in the prison pharmacy or the outside. Correct. Generally, that's the case. Just because we need to verify that what we get is what it purports to be. You're afraid you'll get sued if you administer the eye drops and they aren't quite right. Not to be glib, but if we were just administering medicine of what we get from, even from family members, even from there, we'd probably be in here a lot more often than not than the reverse being true, if I'm being frank. Much is made out of the Haldol. The Haldol, unlike some of the other prescriptions, is actually available in the prison pharmacy. I understand that. I don't know that medicine pretty well, but it's an antipsychotic. My question for you is, the other side makes it sound like the nurse could have prescribed that in an acute or emergency situation, and perhaps you should have done that here. Would she have needed to wait for the doctor's approval to give that, or how would that happen? She would have waited for the doctor's approval. She could have called during that time, if indeed she deemed it necessary. She could have called during that time and gotten there. And that's at AA406 in her testimony. She couldn't administer it herself without an instruction from the doctor. But, you know, in that moment, with what happened, she heard, she assessed the plaintiff, she addressed his physical needs, like we talked about, like it was addressed in the brief, that she addressed his physical needs. She continued to have discussions with him. He talked about needing to die and getting his soul out, which, you know, granted is pretty extreme, but getting his soul out because it's time for him to die. She interpreted that as that it's his time, that he was going to commit suicide, that she needed to do something to prevent that. And that is when she made the decision to go ahead and move forward and have him transferred to the Suicide Prevention Unit until a mental health officer and the supervisor could clear him from it. So I do think she took affirmative deliberate action here. She did not exhibit the deliberate indifference to the mens rea that you're discussing here. Well, here's the thing that troubles me. I know I asked opposing counsel, but here's the thing. I mean, she knows he's suicidal. She knows that he has medication that came in from the mom that has not been given in however long it is. Why isn't that deliberate indifference when, as you say, she could have just called up the doctor on call or whatever and said, this guy is suicidal, we've got these pills here, I guess you can't give them necessarily, but we can at least give him Haldol, will you approve that? Why isn't that deliberately indifferent when it took so long? We're not talking about a few hours. We're talking about a long time when no medicine was given. Yeah, and I understand the question. In this situation, again, she did assess his mental state, and she did have knowledge of this before, but she was attempting to take action to go ahead and prevent him from engaging in any self-harm or anything like that. Now we know we're talking about two different potential dangers here, but I think in this situation it was hard to distinguish one from the other. She just saw a mental health crisis. She saw a potential suicide threat, and she acted on it, and she acted upon it. It certainly does not show apathy or unconcern. I just simply think it does not rise to the level of criminal recklessness in this situation. So she just made the wrong call by saying the suicide prevention unit is good enough and we don't need to do the medicine right now. Exactly, and unfortunately we can go ahead and second-guess everybody, and certainly many have following this, but that's not the standard that we go by. I know I'm going to look at my oral argument here, but that's in regret some things I've said, but that's not the standard for malpractice either. In this situation, it has to be what the Constitution requires. In this situation, she at least acted with what the Constitution requires, not with the mens rea of criminal recklessness. And again, kind of touching on the point that each defendant is liable for their own conduct, that also goes to Dante Fisher. I know we haven't discussed that much, but that was related with Officer Fisher too. Really the claim that based on his role after the aftercare, by his role that he was responsible for the decisions regarding the aftercare, that belies their own record in there in which they point to it being Officer Harris who then transferred it over to Officer Scott. And I think that to some extent that point may be conceded. Nine days prior to filing the reply brief, they filed another action in state court in 1983. Action against Officer Scott as well, and that's been removed from federal court, so now we have that pending as well. With regard to Nurse Martin's testimony and regarding the four or five people, I just wanted to clarify that up as well. She did say there were four or five officers when she got down there. She also testified that the door was open. They were working to try to prevent him from getting the harm by the time she got there. That's also corroborated by her inmate progress notes. The testimony is at AA 405-406, and then the progress notes are at AA 277, and it's the third note in the progress notes. With respect to Officer Harris, again, they referred to Tatum V. Robinson. That was a non-resisting, non-fleeing arrestee, not yet in custody, suspected of committing a non-violent crime. And in that situation, and also in Walkers v. Bowersox and Hickey v. Rear, all those situations, they try to characterize it as simply he was not obeying an order, and that was it. He got up from his knees and he was not obeying an order. With Tatum V. Robinson, it's just simply, like I said, that situation with Bowersox, the person refused to give a food tray and step away from the door. And in Hickey v. Rear, it was a refusal to clean up your cell. In this situation, and they've argued, actually, Mr. Leonard, that these cases are nearly identical to the facts of these cases, but this is not that situation. Mr. Leonard was actively resisting. A person in Officer Harris's position could not know from these cases that his actions were illegal at the time. And I think for that reason, qualified immunity applies to Officer Harris as well. Lastly, with regard to the county's liability, first off, with no underlying violations, there's a county cannot be found liable for the underlying substantive claims. And again, the cases that they had cited to establishing the pattern, a lot of them had been reversed by the time. You know, we got to this point. So we don't think we've had what can establish a pattern, a custom, a consuming widespread and persistent pattern that was ignored. So, Your Honors, if there are any questions. Very well. Thank you for your time. Thank you very much. I appreciate it. I'm afraid we used all Ms. Bryan's time. Hey, I could use this three minutes. Yeah, I'm sure you could. But we've got a busy day, so I think it's been well-ventilated and we appreciate both of your arguments. The case is submitted and the court will file a decision in due course.